Case number 20-3222. David Gearhart v. EI Du Pont De Nemours and Co. Argument not to exceed 15 minutes per side. Mr. Close, you may proceed for the appointment. Yes, good morning, your honors. If it pleases the court, I've always found this court to be expertly familiar with the facts when I began my argument, so I shall assume that to it. Briefly, the facts are that Dave Gearhart went to work for DuPont in 2012, had a heart condition in 2014, had triple bypass surgery, had worked with that heart condition throughout his career at DuPont, had issues with Dr. Kahle in the latter part of 2016 due to Dr. Kahle's permanently restricting him from oven work without any medical information, and for which he requested accommodation but was refused. Dr. Kahle did not obtain any medical information from Mr. Gearhart or from his doctors, including his primary physician or cardiopulmonologist, and eventually, Mr. Gearhart was terminated because he was unable to perform the essential functions of his job in February of 2017. The court in this matter in addressing the issues made several errors. I think the most glaring is the fact that they accepted the fact that there was a letter that was sent to Dr. Thaker by a Dr. Magorian who was Dr., correction, Mr. Gearhart's to Dr. Magorian, who was his cardiologist, and in 2016, in August, that was never made known to either DuPont or Mr. Gearhart until, and Dr. Kahle, until his deposition in 2018, that said that Mr. Gearhart should not work in an oven with high temperatures. High temperatures was never defined by Dr. Magorian. He was never contacted by Dr. Kahle and never opined with regard to the particular job duties of Mr. Gearhart regarding his continuing to work in what was called a kept on oven. Mr. Close, if I may ask you a question. Yes. I mean, as I understand the case, the employer has two doctors who, at the time, said that your client could not safely work in these ovens, that he would have a cardiac risk. One was the Dr. Magorian or the treater, and the other was Dr. Kahle, both examined your client, and your client did have a heart attack and so on. So they're saying he's not qualified to work in there because it would be very dangerous for him. And I guess, I just want to ask you, what evidence would you point to that, in your view, creates a genuine issue as to whether he is qualified? Evidence that would let a jury find that he is qualified to work in the ovens? Well, first of all, allow me to kind of focus a bit on the two doctors. Well, that's okay. That's a negative case, criticizing them. But what I would first like to hear is what is your positive case about why your client was qualified? He worked the position in a kept on oven with all the protective gear that was required up until the time that Dr. Kahle decided he was no longer qualified after a hernia operation. He'd worked that job for about three years. He'd worked it after he had a triple bypass surgery. He worked it during other times. Now, he was intermittently restricted from working it, but was always returned to working that position. And there were never any concerns expressed by any of his supervisors to anyone that he was unable to perform that job. But did he go back to the oven after his heart attack? Yes. He went back to the oven after he was released from full cardiac rehab. His doctor approved a period of rehab for him to undergo after his cardiac surgery. He underwent that rehab. He was fully released. He returned to working in the kept on oven and worked there another two years. What about the primary physician's notation after the 2016 matter that he was the quote unquote can do regular office work? Well, that was with regard to a period of time where he was recuperating from hernia surgery and was prohibited from lifting, which was a temporary restriction on the kept on work. But in fact, what led to Dr. Kale eliminating him from permanently restricting him from kept on work was his return from that hernia surgery, where Dr. Kale did a very cursory examination of the stitching and incision of the hernia, had no medical information regarding the cardiac issues, had not been provided any restrictions regarding cardiac issues. And in fact, four days earlier, Nurse Stone had called Dr. Thaker's office and specifically went over what the restrictions were for the return to work for Mr. Gerhart on the 19th of July in 2016. And none of them involved anything that had to do with his heart. There was no information that Nurse Stone was provided that said that he was in any way restricted because of his heart condition. Well, there's also the issue of whether if he was disabled, the employer offered a reasonable accommodation and whether the employer participated in an interactive process to reach some kind of agreement regarding an accommodation. I don't know if you want to address that while you have the floor here or you want to go back to the threshold issue of whether he should have been considered disabled in the first place. Well, he was disabled because DuPont considered him to be disabled. And the interactive accommodation process, there's an IART, they initiate that whenever someone could not perform the essential functions of their job. So that's how the accommodation process starts with DuPont. During that process, they are required to look at various things. And one of them is, you know, is there a way to accommodate somebody by job restructuring? But the thing that came up at the time and how he was accommodated briefly was he was provided a position, what was called monomer dumping. Monomer dumping does not require of an entry. And he did that position. And DuPont considered that to be a reasonable accommodation. That's why they assigned him to that. However, they did absolutely nothing to determine whether or not is an undue hardship that continuing him in that position would have been an undue hardship for them. They had a blanket prohibition of that any staffing whatsoever, any increase in staffing, which that position would have been for him. But we don't know how much increase in staffing that would have been or how many hours he would have been devoted to it. But their position was blanket. We don't look at increased staffing because increased staffing is always a hardship and we're not going to continue to do that. Do you have, sir, do you have any cases you can point us to for the proposition that as part of this interactive process in good faith, the employer has to be open to the idea of adding new positions, adding new additional staff in order to take on the person who's disabled? Well, I think Roar versus City of Stowe kind of touched upon that because in that case, there was a firefighter's position that was a, an individual was not allowed to drive as a firefighter, emergency vehicles to emergencies. And one of the accommodations that was requested was one, don't make me drive on an emergency condition. And the other was assign me to a position of a fire inspector. And the defendants in that case argued that the fire inspector's position really wasn't a new position because the, all it was was a firefighter who was assigned the duties of an inspector. And in that case, the court said, now we think you're trying to pull a fast one here because that in fact is a position which is available. They had a person who was coming out of that position who could have went into it. So in fact, if it is a firefighter, you really do have a firefighter's, fire inspector's position that's available. Okay, well, we'll take a look at that. Well, in that case, I was on a panel for that case. I don't think the court adjudicated that the issue. It just sent it back for further consideration by the district court. And that's fair enough. We'd be certainly willing for the court to do that in our case, to see whether or not an undue hardship, a blanket prohibition against an undue hardship in this case, would require them to look at whether or not creating a new position would create an undue hardship. I mean, it's statutorily required when you look at what the factors are in an undue hardship. I mean, I'm not saying that they create a new position. They actually had the position that they assigned him to. The question is, continue on in that position. Well, I think you answered my question. Well, I appreciate it. Thank you, Your Honor. I do not have a time clock here in front of me. I can't see one on my screen. I don't know how much time I have left. Well, you're out of time for the time being. You still have your rebuttal time and we'll hear from opposing counsel at this time. Good morning, Your Honors. May it please the court. My name is Jeffrey Kuyper. I'm appearing on behalf of DuPont, the employer. Our position is, of course, that the district court properly adjudicated and granted summary judgment to DuPont on both claims, failure to reasonably accommodate and also disability discrimination or disparate treatment. The court properly analyzed the undisputed facts and applied the applicable law and came to the right conclusion. Now, I'll address many of my colleagues' comments in the course of these subject to any questions. But as to Dr. Kahle's oven restriction, the case law says that it has to be objectively reasonable to place a restriction on an employee. And if it is, then the employer is entitled to rely on that because objectively reasonable reliance is the standard. That's the Michael versus City of Troy Police Department case. Dr. Kahle is not a DuPont employee. Dr. Kahle is an independent occupational medical doctor, and he provides medical opinions at DuPont to make sure employees can safely and without hazard to their health perform their job duties. He has no reason to shortchange Mr. Gerhardt or anyone else. He testified on numerous occasions at deposition that his primary concern is the health and safety of the employee, and it's not his role to make determinations what's better or worse for their job or their career. As far as the statement that there was no medical evidence, Dr. Kahle was quite clear that he went back to the entire big picture, the history of Mr. Gerhardt's situation. He had triple bypass surgery on May 7, 2014, and he was out of work from late April until September 29, 2014, completely out of work. He then came back for most of October, subject to a light duty assignment, and he involved his personal doctors during that period of his health crisis, a Dr. Young, who is a cardiologist, a Dr. Ronald Miller, who was a cardiac surgeon, and another cardiologist named Tertius. They eventually submitted return-to-work documentation that said Mr. Gerhardt could safely return to the oven, and at that point he was. This was November of 2016. Dr. Young also said that he was released to return to oven work so long as he remained asymptomatic from a cardiac standpoint. That didn't happen. In July of 2017, Mr. Gerhardt had a recurrence of cardiac issues, went to the hospital, spent two days in the hospital, had medication change, had elevated blood pressure, then was taken off work for another three to four days by his primary care physician. He came back to work, and he was then he had umbilical surgery in August of 2016, which prevented him from working at all. The point being that when Dr. Kale put a permanent oven restriction on Mr. Gerhardt on August, I believe, 23rd, 2016, here's what he said at deposition, which the district court noted. I was looking at the whole picture. My decision was based on reading what had medically transpired that led up to this, which were hospitalization, transferred to a higher acuity facility, uncontrolled blood pressure, changes in medication, and my number one concern is their safety. Clearly, that is more than just taking Mr. Gerhardt's word for it. Mr. Gerhardt, when he came back in August, did say, my cardiologist is uncomfortable with me working in a hot oven. He told them that. He later said it was, the statement was, he's uncomfortable with anyone working in a hot oven. But the fact is, it was an objectively reasonable determination to restrict Mr. Gerhardt from working in an oven. There are no do-overs in that kind of a position, a person returning from open heart surgery, whose own cardiologist expresses discomfort, and Dr. Kahle taking the whole picture. It was objectively reasonable for him to restrict Gerhardt from that one position, working in an oven where the temperatures get up to 140 degrees, Kevlar suits, heavy PPE, crawling around on hands and knees. That's all the restriction was, oven work. Anything else was not covered. Now, as to the interactive process, that's well-recognized to be a two-way street. The employee has just as much an obligation to proceed in good faith as the employer does. And Mr. Gerhardt argues now that his cardiologist, Dr. Magorian, should have been involved in that process. But there's no evidence in the record that he ever made an effort to present information from that cardiologist. He did that in 2014. So he knew that would be taken into consideration by Dr. Kahle relative to the oven restriction. But he chose not to do that. We did find out later Dr. Kahle didn't even know the name Magorian until his deposition. And it turned out that Dr. Magorian had exactly the same diagnosis based on a full medical exam as Dr. Kahle. Work restriction, due to his cardiac history, Mr. Gerhardt should not work in an oven with elevated temperatures. It confirmed Kahle's medical judgment, again, making it objectively reasonable. So what did DuPont do? They engaged in the interactive accommodation review process. They had, according to Mr. Gerhardt, three to four meetings with him face-to-face. They identified three potential accommodations that he could do. One was elevating him to a higher level position, level four. Another was this monomer dumping assignment that Mr. Close talked about. And a third was he wanted to work in a different area of the plant where oven work was required, but he had heard that it was cooler and less strenuous than the Kapton oven. As to the monomer dumping, that was always known to be a temporary assignment to fill a business need. Monomer dumping was not an individual job. It was part of the overall Kapton casting job, one essential requirement of which was oven work. So once the temporary need for monomer dumping was expired, there was no longer a need. They would have had to hire additional staffing in order to keep him on as a monomer dumper to cover the oven work. And as Judge Cathledge observed, there is no case law that makes that part of the reasonable accommodation obligation. Employers don't have to add additional staffing and they don't have to impair the rights of other employees. Am I correct that there never was a position of one person to work solely in monomer dumping, that that was a temporary position that they created for him while the rest of this was being resolved? That's correct, Judge Guy. Years and years before that, there had been a position of monomer dumping, but that was several years in the past. And by 2016, it was part of the overall job of Kapton casting. So the monomer dumping was actually an effort to reasonably accommodate him for the time period that it was able to do so, but it was not a specific job. I would argue too that in the summary judgment briefing, the appellant waived the argument that monomer dumping should have been a permanent reasonable accommodation because he specifically said that in the response brief, that he was not challenging DuPont's inability to provide that under Armstrong versus city of Melville is a waiver before this court that shouldn't even be addressed. But even though it is being addressed, monomer dumping was not a viable long-term solution. It came down to the being assigned to the Tedlar oven, which rather the Tedlar area of the plant. And again, it has an oven as an essential requirement. That oven gets up to 105 degrees. It also requires PPE. It also requires a strenuous work in elevated temperatures. At that time, Cale got together with human resources at DuPont, an occupational health and safety manager, as well as the area manager for the Tedlar area. And they made the determination that the medical restriction of no hot oven work applied in Tedlar, just as it did in Kapton. So by December of 2016, they had exhausted the options for a reasonable accommodation. And Mr. Gerhart didn't come forward with anything new or any other propositions. And that's when his employment ended with a long-term disability application that was granted. Now, I'd just like to comment quickly. Mr. Close didn't mention it, but the brief has a lot of argument about comparing Mr. Gerhart to an employee named Kim Clark. I would just point out that the case law recognizes longstanding that it's an individualized inquiry, this interactive process. Comparing one employee to another employee who have entirely different situations is not a proper comparison. Ms. Clark had asthma, was precluded from wearing a respirator. This in turn precluded her from doing oven work. And it all happened and she was permanently restricted just as Gerhart was from working the oven in October of 2014. Okay, so this is two years prior to Mr. Gerhart's situation, which is entirely different. Triple bypass surgery in the space of a year and a half, 2016 recurrence of heart problems, hospitalization, elevated blood pressure and the like. Relative to the disparate treatment case, Ms. Clark is not a proper comparator because she's not similarly situated to Mr. Gerhart for the reasons I stated. And also, she's not a non-disabled person. So comparing his situation to hers under the prima facie elements, it doesn't add up. Because she too was disabled and also not similarly situated, Gerhart couldn't satisfy the prima facie elements of disparate treatment. Also, Gerhart, because of the medical restriction, was unable to perform the essential job functions in the Kapton casting area. So with those comments, your honors, unless you have any questions, I'll rest. And I believe the district court's judgment should be affirmed respectfully. Thank you very much. And we'll have rebuttal if there is any rebuttal. Yes, your honor. Thank you very much. I first like to premise my rebuttal by saying that most of the arguments that my colleague has made regarding the defendant's position have been addressed specifically in both the brief and the reply brief. But we're going to touch upon, if nothing else, the objectively reasonable position they've taken regarding whether or not Gerhart was accommodated with regard to continuing to work in Kapton or to work in Tedlar. And according to Dr. Cale's testimony at his deposition, at that time, he did not know what the Tedlar oven temperature was. He didn't know the difference in the layers of clothing. He did no testing whatsoever, which leads us to Ms. Clark, who was prolifically tested at 15 contacts between DuPont's medical office. And she was recommended to three separate doctors. And medical information was solicited on her behalf for over a year while she was not required to work in the oven. So what you're accommodating is the position. She worked in Kapton oven. Mr. Gerhart worked in Kapton oven. She had difficulties with the equipment in Kapton oven, was restricted for it. Mr. Gerhart was perceived to be restricted because of that by Dr. Cale. But most importantly, Dr. Cale was asked whether or not he had made any of Mr. Gerhart's cardiologists regarding his ability. And the response was, he was asked, had you had a conversation with David Gerhart that says you need to get me this information from your cardiologist if you want me to reconsider your restrictions of words to that effect, which is exactly what he had done with Ms. Kim Clark and the respirator at Dr. Chin, which is part of the briefing. And he wouldn't have changed my mind at all. Let me ask you this. Did Dr. Cale have the plaintiff's medical records regarding his cardiac problem available or did the company have or at some point obtained those records, even if they didn't talk, even if Dr. Cale didn't talk to his cardiologist? He had no medical records at that time of the cardiology procedures or recommendations of the cardiologist. In fact, the August 11th letter specifically regarding Mr. Kuyper's testimony was. What did they get? Did they get the medical records? As part of the briefing. Did the company get the medical records at any time? No, they did not. Had they gotten Dr. Kuyper's letter, they would have gotten two things in that letter. They would have gotten one that he said that he should not work in an oven with high temperatures, but he didn't say what high temperature was. And Dr. Cale never made an inquiry on that. And two, he said he was otherwise asymptomatic. Well, the company was well aware of the cardiac problem of your client. Are you saying that all of their knowledge came from Mr. Gerhart himself and what he communicated to the company? You're not saying that, are you? Yes, I am. That's exactly where it came from. They had information that was provided on little return to work slips or releases to return to work, but they had no medical records whatsoever regarding what his particular cardiology state was in August and September of 2016 when Dr. Cale restricted him. He was fully released from the umbilical surgery. Dr. McGorian never provided that letter to him or DuPont or anyone except Dr. Thaker. Wait a minute. He was out of work because of this heart attack and heart surgery and all that. That was two years earlier, Your Honor. Well, I know, but the company had to be aware, had to have known that he had this cardiology problem when he's taken off work and all that kind of thing. So you're not, I mean, there's no dispute about that, I would take it. There's no dispute that he had a cardiology condition. The dispute is that you have Dr. Cale making a recommendation, a medical recommendation that he be restricted from oven work because of a medical condition without ever having reviewed or obtained recent objectivized medical information that Mr. Gerhardt was incapable of performing that job. There is none. Well, Mr. Gerhardt was, I take it, was taking the position that he could work in the oven and that the company should not consider his heart condition an impediment. If that's so, did Mr. Gerhardt bring to the company a physician's statement that he could, without placing himself in jeopardy, work in the oven? No, he never did that because he was never asked to. Dr. Cale made the decision to permanently restrict him upon his return from umbilical surgery. It had nothing to do with his heart. This came as a surprise. This was out of the clear blue, being returned to work from a hernia surgery. But he never, he never came forth with any medical documentation saying that he could work in the oven notwithstanding his heart attack or his heart surgery. The question becomes is, at that point, does he have an obligation to affirmatively come forward and say, I can do a job when he hasn't been restricted from a job by his medical doctor? Dr. Cale's the one who did that. If Dr. Cale wanted to restrict him on the basis of medical information, Dr. Cale should have reached out like he did with Kim Clark and recommending three separate pulmonologists for her from the company. These weren't Kim Clark's personal physicians. He had a different medical condition and medical history, so I'm not sure what was done with this other person should really determine what our decision here. I understand. I don't think that what the medical condition is and what a medical doctor reaches out for in terms of the request for accommodation should have, it should have no bearing upon whether or not the doctor reaches out for some type of medical information but doesn't reach out for other type of medical information. You're requesting an accommodation based on a medical condition. Whatever that medical condition is, that doesn't necessarily allow the doctor discretion to say, well, I don't need to ask about this medical condition, but I do need to ask about another one. That's, I think, inherent in the interactive process. Okay. All right. When you've previously called, as did, I'm sorry. I couldn't hear you. Oh, yeah. I know we're out of time for your argument and I think we understand the position. All right. We will review the case submitted and thank counsel for the arguments.